UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DONNA MILLS, Administratrix of the Estate of Charles Harris, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 6:18-CV-88-REW-HAI |
| v. | ) ) | OPINION & ORDER |
| OWSLEY COUNTY KENTUCKY, et al., | ) ) ) | |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The Court confronts Defendants' summary judgment motion as to all counts (DE #64), Plaintiffs' partial dispositive motion as to Counts IV and V (DE #69), and Defendants' motion to exclude certain expert testimony (DE #62). For the reasons that follow, the Court denies, largely, the motion to exclude. The Court denies in part and grants in part the cross-motions for summary judgment.

The Owsley County Sheriff and his directly supervised deputy created a needlessly violent confrontation on March 22, 2017. A jury must decide several contested aspects of the case and the claims presented. However, the Constitution extends to Booneville. Sheriff Shouse and Deputy Havicus, in several concerning respects, showed little regard for the limits on police power enshrined in the Bill of Rights. The avoidable interaction between them and the Harris family, at Charles Harris's home, cost Harris his life and surely marked forever the lives of his minor children. The Court finds a dispositive ruling proper on parts of the case, but the core must go before a federal jury.

1

## I.     BACKGROUND

Several discordant voices tell the chaotic tale of Charles Harris's last night and final moments. Though the parties agree on the general factual progression of the night in question, key details are in dispute. The relevant events began on the evening of March 22, 2017 when, per the testimony of Harris's former girlfriend, Janice Alexander, Harris became verbally and physically aggressive with her in Alexander's apartment.[1] DE #66 (Alexander Dep.) at 9–10.[2] She testified that it was the second time in a matter of weeks that Harris had become violent toward her. *Id.* at 9. Alexander had been caring for her infant grandson (the son of her daughter, Tisha McIntosh) at the time of the March 22 incident. *Id.* Immediately following the altercation, Alexander left her apartment and went to the nearby apartment of her daughter, McIntosh; on the way, Alexander phoned Harris's sister, Vickie Hacker—the manager of Alexander's and Harris's apartment complex—to warn Hacker that Harris was, per Alexander, "at it again." *Id.* at 10, 14; DE #71 (Hacker Dep.) at 54.[3] The phone call woke Hacker, who had been in bed sleeping, sick. DE #71 at 53–54. Per Hacker, Alexander threatened to call police on Harris, and Hacker advised her to "[g]o ahead and call [the law]." *Id.* at 63.

---

[1] Harris and Alexander each lived in the Booneville Homes, managed by Harris's sister, Vickie Hacker.

[2] Deposition cites reflect CM/ECF pagination, except as noted.

[3] Hacker testified that Alexander wanted her (Hacker) to talk to Harris and convince him to talk to Alexander (DE #71 at 54); Alexander, however, denied wanting to speak with Harris after the incident (DE #66 at 10). This detail is largely immaterial in the case. It is further unclear whether there was one, or two, calls from Alexander to Hacker before the officers arrived. DE #71 at 62. This detail is likewise not material in the case.

By the time Alexander reached McIntosh's home, McIntosh understood that some altercation had occurred between her mother and Harris.[4] DE #66 at 10. Motivated in part by concern surrounding her son's presence during the altercation, McIntosh resolved to call police and phoned Owsley Deputy Havicus. DE #68 (McIntosh Dep.) at 5. After McIntosh called, Havicus came to McIntosh's residence to talk with Alexander. DE #66 at 10; DE #68 at 6. Alexander summarized the night's events for Havicus, told him she would like to pursue a restraining order against Harris, and warned him that Harris might be dangerous. DE #66 at 10 (Alexander testifying that she told Havicus not to go to the apartment himself because Harris had said that "if the law came over there, they would kill him, or he would kill them"); DE #68 at 6 (McIntosh recalling that Alexander warned Havicus that there might be a gun in her apartment and told him not to go to the Booneville Homes alone); DE #59 (Havicus Dep.) at 169 ("And then she said, don't go alone, that he's threatening saying he would gut the police if they came to arrest him."); id. at 187 (Havicus testifying that Alexander told him there was a gun at her apartment and that Harris would be armed with knives). During his interaction with Alexander, Havicus observed no visible injuries on her person. DE #59 at 169. The physical interaction involved a thrown remote and Harris shoving Alexander onto the couch.

Immediately after leaving McIntosh's residence, Havicus called Owsley Sheriff Shouse for assistance. Id.; DE #60 (Shouse Dep.) at 130 ("At some point he told me that she had told him not to go by himself . . . [S]he said that he had two knives and possibly a gun."); id. ("[Harris] said if law enforcement come, . . . that he was going to gut them."). Havicus then picked up Shouse at

---

[4] Alexander testified that McIntosh's housemate and partner, Ricky Gabbard, may have informed McIntosh about the assault, as he had arrived at Alexander's home immediately after it to retrieve McIntosh's son (though Alexander ultimately left the premises with the child, rather than handing him over to Gabbard) and may have known something was amiss. DE #66 at 10.

Shouse's residence, and the pair proceeded to the Booneville apartments. DE #59 at 184–85. They first visited Alexander's apartment and, upon determining that Harris was no longer there, decided to approach Harris's apartment to question him. *Id.* at 187. At Harris's, the officers could hear sounds inside that indicated people were present in the apartment, but no one answered the door when Havicus knocked and announced that it was the Sheriff's Office outside. *Id.* at 192. Per Harris's daughter, Alexis, this took place at approximately 11:03 p.m. DE #65 (Alexis Dep.) at 19[5] ("I heard banging on the door and people were like, trying to say, 'Charlie, open the door. We just want to talk.' That's when I looked over at my alarm clock and it said 11:03."). Unable to convince Harris to answer the door, Havicus called Hacker for assistance. DE #71 at 65. Havicus and Shouse were already back at Harris's door when Hacker arrived at the apartment. *Id.* at 67–68. Hacker simply understood that the officers wanted to "talk to [Harris] and ask him a few questions," but did not fully understand the reason for their visit. *Id.* at 68.

Hacker also attempted to knock on the door and persuade Harris to answer it. DE #65 at 19 (Alexis observing that "[m]aybe one or two minutes" elapsed between the first knocks on the door and those accompanied by Hacker's voice: "Vickie was out there saying, 'Charlie, open up. They just want to talk.'"). Harris eventually opened the door "a few inches" to talk to Hacker. DE #71 at 76–77. Hacker said: "These boys want to talk to you. They just want to ask you some questions." *Id.* at 77. Per Hacker and Alexis, Harris responded by refusing to come outside and also refusing the officers entry to his apartment. *Id.* (Hacker testifying that she "heard Michael ask him to step outside. And [Harris] said, 'I'm not.' And [Harris] said, 'You're not coming in here.' That's when Kelly laughed and says, 'He told me I couldn't come in his house. Well, I'm going in anyway.'");

---

[5] Though the parties variably use A.H. to refer to Alexis—a minor at the time—the public record contains her full name in several instances. The parties have made no attempt to seal these references and, thus, the Court simply uses her full first name. She is now of age.

DE #65 at 19 (Alexis testifying that Harris "went, stood by the door, looked out the peephole. I guess he could only see Vickie or something, because he opened the door. He opened his black knife, his blue and black knife, and he put it in his back pocket while it was open. He cracked the door, and [Shouse and Havicus] pushed their way in through Vickie.").[6] Hacker followed the officers into the apartment. *Id.*

With everyone inside the apartment, Harris was insisting that he had done nothing wrong and ordering the officers to leave. *Id.* Per Hacker, Defendants had their weapons drawn upon entering the unit. DE #71 at 82–83. Harris began to back away and went down the hall toward the bedroom, eventually entering the room and closing the door. *Id.* at 88. Hacker testified that Havicus was, at the time, threatening to shoot Harris. *Id.* The events unfolded quickly once Harris reached the bedroom. Havicus followed, kicked in the door, and—he says—was greeted by a knife-wielding and uncooperative Harris. DE #59 at 207–210 (Havicus testifying that he kicked the bedroom door off the hinge "[a]nd when I go into the bedroom, he's standing there with a knife in his hand, in his right hand, with it up in the air. And at that time, that's when I draw my weapon and start telling him to drop the knife, to drop the knife. And he keeps progressing forward to us."). Havicus testified that Harris, knife in hand, "back[ed] [the officers] all the way up into the living room." *Id.* at 208.

In the living room, per Havicus, the group had no room left to retreat, and Havicus was backed against the front door of the apartment. *Id.* He recalls multiple people telling Harris to drop the knife and cooperate. *Id.* In the moments that followed, Havicus says that he perceived Harris lunging toward him with the knife: "[Harrris] said, I'm not afraid to die, and that's when he . . .

---

[6] Defendants mildly disagree, claiming that Harris opened the door and stepped aside. *See, e.g.*, DE #60 at 193 ("Did you push the door open when you entered the apartment? . . . No, the door was open, the front door.").

kind of lunged toward me with that [knife], and that's when I fired one round hitting him in the torso area." *Id.* at 210; *see id.* (Havicus testifying that, after firing the shot, he went "up to . . . Harris, where he's laying there, and the knife is on the right side with his right hand" and Havicus "pick[ed] up the knife and . . . [threw] it into the kitchen area"). Per Hacker, Shouse, who had veered into the kitchen of the apartment, was directing Havicus to shoot. DE #71 at 102 ("And I hear Shouse hollering, 'Shoot him.'").

The parties sharply disagree on whether Harris was in fact holding a knife during these events. Alexis agrees with Havicus that Harris was holding a knife in his hand after leaving the bedroom. DE #65 at 20 ("Dad had come back with his knife down at his side. He was holding it in his right hand."); *id.* (recalling that people were telling Harris to drop the knife); *id.* at 24 (testifying that Harris had a knife when he exited the bedroom); *id.* at 24–25 (noting that Alexis and Hacker told Harris to drop the knife).[7] Shouse too remembers a knife. DE #60 at 208 ("The door come off and Charlie had a knife right there in the doorway, right in front of us."); *id.* at 216 ("I was begging him to drop the knife."); *id.* at 218 (testifying that Harris "[r]aised the knife up . . . toward him, started toward him, right towards Michael"). Hacker and Harris's son, Straven, however—both also present in the apartment as these events unfolded—recall things differently; neither of them recalls Harris visibly holding any knife. DE #71 at 110–11 (Hacker testifying that she never saw Harris holding knife before, during, or after the shooting and that she never told him to drop any knife); *id.* at 95 ("When he brought his right hand around, I seen his fists clutched, but I couldn't see anything sticking out of his fists. He appeared to have something in his hand, but I

---

[7] Alexis further says that her then-guardian, Timmy Harris, and her brother, Straven (present during these events) asked her to change her story concerning the knife. DE #65 at 28 ("Timmy and Straven, the next day they asked me what I wrote in this, and I told them my side of the story. They wanted me to change my story and tell them no, that I did not see a knife because Straven didn't see a knife or Vickie[.]").

couldn't see anything sticking out from either side of his hand. It looked like a clenched fist to me."); DE #67 (Straven Dep.) at 18–20 (testifying that Harris was not holding anything in his hands during the altercation and that Straven did not see (Straven is hearing impaired) anyone tell Harris to drop a knife). As Defendants point out, though, Hacker's and Straven's testimony conflicts with their earlier statements to KSP officers, in which both conceded they observed Harris with a knife. *See* DE ##64-7, 64-9.

In the moments after the shooting, Shouse aggressively cleared everyone from the apartment. Hacker, Alexis, and Straven describe his method as unnecessarily forceful, with gun drawn. DE #65 at 20 ("They threw Straven out, and he hit his collar bone on the door frame . . . and Kelly grabbed me by my upper arm and he was squeezing really tight and he put a gun to my head, and all I thought is I was going to die, . . . and he dragged me out the door[.] . . . Kelly went back in and closed the door, so I walked over toward Vickie and towards Straven, and Straven was crying and they almost, like, when they threw him out he almost went over the rail[.]"). Shouse also called the KSP, seeking medical attention for Harris. DE #60 at 219–20 (Shouse testifying that he called an ambulance service and the KSP immediately after the shooting); *id.* at 221 (Shouse testifying that he called for medical attention and KSP assistance within moments after the shooting). Hacker also called and alerted Alexander to the situation. DE #71 at 53.

Plaintiffs filed this action in March 2018, asserting several federal and state claims arising out of the entry into Harris's apartment, the deadly shooting, and the aftermath involving Hacker, Alexis, and Straven. DE #1 (Complaint). Both parties seek summary judgment; Defendants as to all claims (DE #64), and Plaintiffs as to only the federal unlawful entry and false arrest counts (DE #69). Defendants also seek to strike certain portions of Plaintiffs' expert report. DE #62. All motions are fully briefed and ripe for ruling. DE ##81, 85, 73, 80, 76, 79.

## II.    MOTION TO EXCLUDE

Defendants take issue with Plaintiffs' police practices expert, Gregory Gilbertson. *See* DE #62-1 (Gilbertson Report).[8] They do not challenge his qualifications to testify or the foundation for his testimony, and the Court thus does not discuss that topic; rather, Defendants argue that several of his "opinions" urge improper credibility determinations and invade the factual province of the jury. Movants correctly recognize the general rule "that expert witness testimony [should] not be used for the purpose of assessing another witness's credibility on non-technical or non-scientific points." *H.C. Smith Investments, L.L.C. v. Outboard Marine Corp.*, 181 F. Supp. 2d 746, 751 (W.D. Mich. 2002) (collecting cases).

Certainly, a properly credentialed police-practices expert can help a jury understand the viewpoint of a reasonable officer. That viewpoint, not fully in the ken of a lay juror, colors many of the claims at issue. Although the Court will not allow any expert to opine about credibility, Gilbertson can describe the factual basis and any assumptions that support his analysis. The Court will properly instruct the jury on the limits of expert proof.

A few of Gilbertson's statements edge toward the credibility prohibition, namely parts of those in 38, 39, and 47. In each statement, Gilbertson seizes on aspects of witness testimony that

---

[8] For a challenge to a purported expert, the Court acts as gatekeeper to evaluate admissibility. *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786, 2798–99 (1993) ("assign[ing] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); *see also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1175 (1999) (applying the *Daubert* inquiry to non-scientific testimony); *United States v. LaVictor*, 848 F.3d 428, 440–44 (6th Cir.), *cert. denied*, 137 S. Ct. 2231 (2017); *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526–28 (6th Cir. 2014). Under "*Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert . . . is qualified and will testify to [ ] knowledge that will assist the trier of fact in understanding and disposing of" relevant issues and that the testimony is reliable. *Pride v. Bic Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). In the Sixth Circuit, "rejection of expert testimony is the exception, rather than the rule[.]" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008).

bear principally on credibility, such as the witness's ability to perceive or recall the events in question. In the paragraph 47 statement, Gilbertson further opines that Shouse's and Havicus's testimony is "disingenuous" in part. Critically, Plaintiffs have advanced no reason why Gilbertson's assessment of witness credibility would be relevant or helpful for the jury (or allowed) in this particular case. The Court finds these statements (to the extent they directly comment on credibility) improperly geared toward evaluating witnesses' credibility and, thus, finds them unhelpful to the jury and impermissible. That said, it is fair for Gilbertson to critique law enforcement's investigative and observational quality. The Court will police the line at trial.

Closely related, though, are the statements Defendants argue are founded in a Plaintiff-favorable version of the facts. These, comprising the remaining statements Defendants challenge, are proper, in context. The Court agrees with Plaintiffs that, at some level, every case with disputed facts requires a party's expert make some factual assumptions and decisions concerning what to believe or the version to adopt. *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("In almost all cases-and perhaps especially in excessive force cases, there will be a conflict in the testimony of the witnesses. It is precisely because experts are prohibited from resolving these conflicts-the very rule contended for by the plaintiff-that the expert's opinions necessarily must be based on someone's version of the incident.").

There is a logical and practical distinction between factual recitation and factual application or analysis. The former, though perhaps needed only in small doses to indicate the basis for the expert's opinion, is presumptively duplicative of the fact witnesses' testimony; the latter, however, is precisely the expert's role in the case—to offer jurors an expert perspective within the factual context of the case. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 467 (S.D.N.Y. 2010) (permitting some factual description but noting

that "expert testimony should focus on the expert's opinions and factual analysis rather than on a recitation of facts"); *Grayiel v. AIO Holdings, LLC*, No. 3:15-CV-821-CHB-CHL, 2019 WL 2372899, at *3 (W.D. Ky. Apr. 29, 2019) (observing that "providing testimony that does apply the facts of the case" is precisely the expert's role and noting that the opposing side would have to combat such testimony at trial).

Accordingly, the Court declines to preliminarily exclude or strike any portions of the Gilbertson testimony. The Court will monitor the proof at trial and ensure that any expert's fact-intensive testimony focuses on factual interpretation and analysis, rather than duplicative fact recitation or improper credibility assessment. The Court will not allow Gilbertson to opine about officer intent or motivation, officer predisposition (¶ 31), witness credibility, participant internal perception (such as fear, ¶ 36) or witness sincerity. Those areas are off-limits. The Court will allow Gilbertson to explain his adopted view of the facts as the conditional foundation for his stated opinions about the policing on the night in question. That testimony, at least viewed from a pre-trial perspective, will be relevant and reliable, under the Rule 702 rubric.

For these reasons, the Court **DENIES**, though on terms, DE 62.

## III.   SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

The summary judgment standard remains the same where the parties pursue cross-motions; the Court "must evaluate each party's motion on its own merits" and, in doing so, "draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted); *accord Lansing Dairy Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## IV.    SUMMARY JUDGMENT ANALYSIS

The Court first cleans up the claim slate. The Complaint does not clearly identify the precise parties to each claim; given this umbrella approach, the Court must clarify which claims pertain to which parties. Fairly construing the claim-specific allegations, and consistent with the parties' treatment in briefing Defendants' summary judgment motion,[9] the Court perceives that Plaintiffs maintain the following causes of action: (1) § 1983 excessive force claims by the Estate against Havicus and Shouse (for the fatal shooting),[10] by Hacker against Havicus (for the firearm discharge), and by Hacker, Alexis, and Straven against Shouse (for their post-shooting removal

---

[9] Defendants' summary judgment motion explicitly outlines the particular parties applicable to the various claims; Plaintiffs do not dispute or otherwise address that delineation, but their responsive arguments track Defendants' interpretation of the claim contours.

[10] To the extent Defendants argue that Shouse cannot be liable for the deadly force use because he did not fire the weapon, they are incorrect. Plaintiffs' version of events, supported adequately by the record, plainly demonstrates Shouse's supervisory involvement as a theory of recovery.

from Harris's apartment);[11] (2) a § 1983 deliberate indifference claim by the Estate against Shouse and Havicus; (3) § 1983 failure to protect/intervene claims by the Estate against Shouse (as to the shooting) and by Hacker, Alexis, and Straven against Havicus (as to Plaintiffs' removal from the apartment); (4) a § 1983 false arrest claim by the Estate against Havicus and Shouse; (5) a § 1983 claim for unlawful entry by the Estate against Havicus and Shouse; (6) *Monell* claims by all Plaintiffs against Owsley County (based upon the officers' alleged excessive force and unconstitutional intrusion into Harris's apartment); (7) Kentucky[12] assault and battery claims by all Plaintiffs against Shouse and Havicus;[13] (8) Kentucky false arrest/imprisonment claims by all Plaintiffs against Shouse and Havicus; (9) a Kentucky law claim for intentional infliction of emotional distress by all Plaintiffs against Shouse and Havicus; (10) a Kentucky wrongful death claim by the Estate against Shouse and Havicus; (11) a Kentucky negligence claim by all Plaintiffs

---

[11] Each of Counts 1 through 5 applies, in practical effect, to Shouse and/or Havicus in individual capacities. Any § 1983 official-capacity claims against the two officers are functionally claims against Owsley County. *See Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent . . . [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal quotation marks and citation omitted). Plaintiffs must (and do) bring such official-capacity-type claims under *Monell v. Dep't of Soc. Servs. of City of New York*, 98 S. Ct. 2018 (1978). *Id.* at 3106 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, *supra*, local government units can be sued directly for damages and injunctive or declaratory relief.").

[12] The Court must evaluate the state claims under Kentucky law. *See, e.g.*, *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) ("A federal court exercising supplemental jurisdiction is bound to apply the [substantive] law of the forum state[.]").

[13] Absent waiver, sovereign immunity protects Owsley County on the state claim front. *See Schwindel v. Meade Cty.*, 113 S.W.3d 159, 163 (Ky. 2003). Plaintiffs have not alleged waiver in this context. The state law claims thus proceed against Havicus and Shouse in their individual capacities; in their official capacities, as representatives of the County, the officers also enjoy absolute immunity. *See Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001) ("Official immunity can be absolute, as when an officer or employee of the state is sued in his/her representative capacity, in which event his/her actions are included under the umbrella of sovereign immunity . . . . [W]hen an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled[.]").

against Shouse and Havicus; (12) a Kentucky claim for loss of parental consortium by Alexis and Straven against Havicus and Shouse; and (13) a request for punitive damages arising out of the above-asserted violations of law.[14]

The Court evaluates each claim in turn within the summary judgment rubric.

A.      *§ 1983 Excessive Force (Count 1)*

The Fourth Amendment typically governs excessive force claims, including those involving deadly force. "When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015); *Tennessee v. Garner*, 105 S. Ct. 1694, 1699 (1985) (observing that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989). This inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The Court's handling of the facts must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* In

---

[14] The punitive damages claim is not a stand-alone cause of action; rather, it is tied to the various state and federal claims for compensatory damages. *See Lawrence v. Risen*, 598 S.W.2d 474, 476 (Ky. Ct. App. 1980) ("Without a factual allegation of actual compensatory damages, punitive recoveries cannot be sustained."); *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (observing that "[p]unitive damages are appropriate in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").

assessing those circumstances, the Court centrally considers "three main factors: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (quotation marks omitted) (alteration in original).

"When an officer uses deadly force," in particular, "the critical factor is whether the suspect presented an immediate danger to the officers or others." *Id.* (quoting *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)). "[A]n officer's use of deadly force is only reasonable if she had probable cause to believe that the suspect pose[d] [such] a threat." *Id.* (quotation marks omitted).[15] "In excessive force cases, the threat factor is a minimum requirement for the use of deadly force, meaning deadly force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Mullins*, 805 F.3d at 766 (quotation marks omitted). "The fact that a situation unfolds quickly does not, by itself, permit [officers] to use deadly force[.]" *Id.* (quotation marks omitted).

---

[15] Probable cause is a common-sense, "fluid," "practical," and "nontechnical" analysis that looks (through an objective prism) to the totality of the circumstances known at the time. *Maryland v. Pringle*, 124 S. Ct. 795, 799–800 (2003); *Whren v. United States*, 116 S. Ct. 1769, 1773–74 (1996); *Illinois v. Gates*, 103 S. Ct. 2317, 2331–33 (1983).

> There are certain facts and circumstances that have been held to be important when evaluating whether an officer has probable cause to believe deadly force necessary. The most common considerations are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (quoting *Graham*, 109 S. Ct. at 1872). Other relevant factors include "the number of lives at risk" and "the 'relative culpability' of those at risk," as well as the suspect's demeanor and "the size and stature of the parties involved." *Id.* (internal quotations omitted). A court may further consider whether the suspect "was intoxicated and noncompliant." *Id.* However, these "factors do not constitute an exhaustive list; the ultimate question is whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (quotation marks omitted).

The Court segments its analysis, considering the reasonableness of each distinct force use separately. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (collecting cases that have "analyze[d] excessive force claims in segments"). Thus, though the Court evaluates "the totality of the circumstances to determine whether the force used was reasonable" in each instance, *see id.*, it confines the applicable circumstances to those surrounding the particular use of force at issue. *See, e.g., id.* at 1162 ("limit[ing] the scope of [ ] inquiry," for purposes of analyzing a specific usage of lethal force, "to the moments preceding the shooting"); *see also Chappell v. City Of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (directing a "segmented analysis of the totality of the circumstances facing the detectives at the time they made their split-second judgments immediately prior to" the particular force usage) (quotation marks omitted).

In supplemental filings, Plaintiffs scrap over the "segmented" analysis specifics. They contend that Defendants, because they rely upon *Hicks* (*see* DE #90, Supplemental Authority Notice), advocate "a segmented analysis based on distinct factual/time-oriented events." DE #92; *see Hicks*, 958 F.3d at 437 (stating that "the only inquiry that matters is whether, in the 'moment' before using deadly force, an officer reasonably perceived an immediate threat to her safety"). To the extent *Hicks* requires such an approach, Plaintiffs argue that it conflicts with Supreme Court precedent—namely, *City of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). *Mendez*, as Plaintiffs recognize, rejected the Ninth Circuit's provocation rule, which imposed liability on officers for excessive force use, even if that force were deemed reasonable in the moment it occurred, where the officers' previous constitutional violation(s) contributed to the need for such force. *Id.* at 1543 (describing the provocation rule as one holding officers "liable for injuries caused by the seizure on the ground that they committed a separate Fourth Amendment violation that contributed to their need to use force," even if the force was "judged to be reasonable based on a consideration of the

circumstances relevant to that determination"); *id.* at 1547 ("Contrary to this approach, the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). Plaintiffs argue that *Mendez* is inconsistent with *Hicks* because *Mendez* requires segmentation into distinct "claims" while *Hicks* directs segmentation into distinct "acts." DE #92 at 2–3 ("What [*Mendez*] did not say is that the analysis is segmented to distinct acts, but only claims."). Moreover, Plaintiffs say, *Mendez* "espouses" a proximate cause analysis. *See id.* at 3 (citing *Mendez*'s statement "that plaintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation").

The Court is not persuaded by the artificial acts vs. claims distinction; the cases suggest no daylight between the concepts. *Mendez* expressly directs separate consideration of, for example, "each search or seizure that is alleged to be unconstitutional." *Id.* at 1547. The search and the seizure here—each its own event—both are separate acts and generate separate Fourth Amendment claims. Further, the favorable proximate cause reference Plaintiffs cite is, in context, in reference to damages, not liability. In fact, the *Mendez* Court criticized the Ninth Circuit's conclusion that "even without relying on [the] provocation theory, the deputies are liable for the shooting under basic notions of proximate cause." *Id.* at 1548. Per the Supreme Court, "the Court of Appeals' proximate cause analysis, like the provocation rule, conflated distinct Fourth Amendment claims and required only a murky causal link between the warrantless entry and the injuries attributed to it." *Id.* at 1549. Thus, though the Court noted that force injury *damages* could potentially (and proximately) flow from the prior entry violation, it found that the proximate cause question as to damages was separate from that as to underlying liability: "[I]f the plaintiffs in this case cannot recover on their excessive force claim, that will not foreclose recovery for injuries

17

proximately caused by the warrantless entry. The harm proximately caused by these two torts may overlap, but the two claims should not be confused." *Id.* at 1548.

At its core, it seems the argument Plaintiffs intend to make is the same one raised, and expressly left unaddressed, in *Mendez*: Respondents "argue that the judgment below should be affirmed under *Graham* itself. *Graham* commands that an officer's use of force be assessed for reasonableness under the 'totality of the circumstances.'" 137 S. Ct. at 1547 n.2. "On respondents' view, that means taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id. Mendez* did not, however, decide whether a *Graham* totality analysis, at the outset, involves consideration of preceding constitutional violations. *See id.* ("All we hold today is that once a use of force is deemed reasonable under *Graham*, it may not be found unreasonable by reference to some separate constitutional violation."). These *Mendez* clarifications make clear there is no *Hicks-Mendez* tension; *Hicks*, addressing the question *Mendez* left unanswered, followed Circuit precedent to conclude that an officer's contribution to a dangerous situation does not bear on the *Graham*-governed reasonableness of the force subsequently used. *See Hicks*, 958 F.3d at 437 (quoting *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017)) ("Under the 'segmented analysis' employed by this court, however, '[w]e do not scrutinize whether it was reasonable for the officer to create the circumstances'"); *Thomas*, 854 F.3d at 365 (framing the *Graham* inquiry as consideration of "the officer's reasonableness under the circumstances he faced at the time he decided to use force"). And this makes sense: if the dispositive question is simply whether a reasonable officer in the defendant's shoes would have perceived a threat based on the information available to him at the time, it matters not whether prior officer culpability in part gave rise to the threat. The key is the officer's objectively measured

18

perception and response, not the reasonableness of the suspect's conduct, or of the fact that the tense situation existed.

In sum, in assessing under *Graham* the force used in this specific case, Havicus's and Shouse's prior unlawful entry (as Plaintiffs allege it to be) is legally irrelevant in determining whether, from the totality of the circumstances and information available to Havicus at the time of the shooting, he reasonably perceived Harris as a threat. *See Thomas*, 854 F.3d at 365 (requiring courts to decide whether officers "act[ed] reasonably on the information they ha[d]" at the time the force was used). Nor do Plaintiffs explain how the earlier entry could be relevant to the force question in this case. Accordingly, per *Hicks* (and earlier Sixth Circuit cases) and consistent with *Mendez*, the Court limits its force reasonableness inquiry to the facts (circumstantially about the unfolding situation, and historically about Harris's alleged crime and purported risk to others)[16] that a reasonable officer in Havicus's position would have acted on at the time of the shooting. In other words, the Court looks at the totality of the circumstances as they existed at the time of the alleged excessive force, without respect to how they might have been exacerbated by prior officer conduct. *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) ("[T]he court should first identify the seizure at issue here and then examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.") (quotation marks omitted); *see also Dickerson*, 101 F.3d at 1161 (observing that "[t]he time-frame is a crucial aspect of excessive force cases" and reasoning:

---

[16] In this sense, though the analysis is confined to what Havicus knew as of the "moments" before the shooting, facts learned earlier in the evening remain relevant to that real-time, momentary assessment of impending risk—such as the danger, or lack thereof, that Havicus believed Harris posed because of his alleged assault crime, as described by Alexander.

"If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble.").

This overarching Fourth Amendment reasonableness inquiry folds into the qualified immunity framework. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Qualified immunity protects an officer unless the plaintiff demonstrates that "(1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional." *Hicks*, 958 F.3d at 430 (6th Cir. 2020). The Court may address the two prongs in any sequence. *See id.* "A right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton*, 949 F.3d at 947 (6th Cir. 2020) (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation omitted)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 947–48.

"After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* at 947. At bottom, the doctrine "allows police officers breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation marks omitted). However, as to this context, "qualified immunity is available only where officers make

split-second decisions in the face of serious physical threats to themselves and others." *Mullins*, 805 F.3d at 766–67.

Against this backdrop, the Court assesses each allegedly unconstitutional seizure.

### The Estate's Claim Against Havicus (Deadly Force)

The record reveals two contrasting theories. The first: Havicus was responding to a violent domestic disturbance call and dealing with a man (Harris) that the alleged victim had described as armed (with knives and perhaps a gun) and dangerous toward law enforcement and/or himself. Under these circumstances, Havicus had probable cause to believe that Harris posed a severe threat as Harris—having ignored the officer's (and other witnesses') verbal commands or pleas to drop the weapon and cooperate—was lunging toward Havicus, from mere feet away in a confined room, and brandishing a long knife. The second: Havicus (with Shouse voicing encouragement) fatally shot non-threatening Harris, who was brandishing no weapon,[17] as he stood across a living room in his own home, while Harris's sister and children pleaded with the officers not to shoot Harris. And, Havicus, having seen Alexander in McIntosh's apartment, knew Alexander was visibly uninjured, tempering the dangerousness and severity of Harris's alleged assault crime as Havicus understood it. In this version, no reasonable officer could have perceived Harris as a threat. Both sides have some record support, enough to reserve the matter for the jury.

The former scenario, argued by Defendants, would entail no constitutional violation, and qualified immunity would protect Havicus. The latter, however—Plaintiffs' theory—requires denial of qualified immunity, provided Harris's right not to be fatally shot under these

---

[17] The record unequivocally establishes that Harris had a knife in his back pocket at the time of his death. A dispute, however, exists as to whether Harris was holding a knife during the altercation with Havicus. It is further unclear, from the record, whether Havicus had ever been warned that Harris would be armed with a firearm.

21

circumstances was clearly established at the time of the events in question. Three critical factual issues, each disputed but with at least some record foundation, separate the theories: whether Alexander had told Havicus that Harris was dangerous (and perhaps armed with a gun), whether Harris was visibly pointing a knife at Havicus, and whether Harris approached or lunged toward Havicus in close quarters immediately before the shooting. Resolving these questions in Plaintiffs' favor, as the Court must in this posture, precludes qualified immunity as to Havicus's role in the fatal shooting. The Court is not a factfinder, must view the record in the light most favorable to the non-movant, and must afford the non-movant all reasonable inferences.

The right not to be fatally shot by police under the circumstances as Plaintiffs allege them was clearly established at the time of the events in question. By 2012—approximately five years before the fatal shooting in this case—it had "been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (*King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (internal quotation marks omitted)). "The right of an individual not to be subjected to the use of deadly force by an officer who lacks probable cause to believe that the individual posed a threat of serious harm to the officer or others has long been clearly established in this circuit." *Zulock v. Shures*, 441 F. App'x 294, 303 (6th Cir. 2010). Defendants do not argue otherwise; rather, they contend that it was not clearly established that "Harris had a constitutional right not to be shot when he raised his knife and took a step toward Havicus[.]" DE #18 at 44. True enough. But, that is Defendants' version—according to Plaintiffs, Harris neither raised any knife nor took a step toward Havicus. Plaintiffs' facts characterize Harris as non-threatening, from an objective perspective; it was clearly established that, under such circumstances, Harris had a right

to not be fatally shot.[18] *See Zulock*, 441 F. App'x at 303 (noting that even in "entirely novel" circumstances, "where a general constitutional rule (such as the Fourth Amendment's bar on unreasonable seizure) applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity"). The claim thus clears this first qualified immunity hurdle.

Further, if the Plaintiffs' version of events is accurate, the lethal force was unreasonable, and a constitutional violation occurred. "Although merely possessing a weapon does not justify deadly force, the reasonableness of an officer's asserted fear will often turn on whether an armed suspect pointed her weapon at another person." *Hicks*, 958 F.3d at 435 (quotation marks and citation omitted) (collecting cases). For example, "if a suspect possessed a gun," courts "generally deny qualified immunity only if there is a genuine dispute of fact as to whether the gun was pointed at someone." *Id.* In *Hicks*, the Court granted qualified immunity on the excessive force claim because there was "no genuine dispute that Quandavier pointed his rifle directly at Scott in the moments before he was shot." *Id.* Similarly, the Circuit found deadly force reasonable (a second shot, immediately following a first that made contact with the suspect) where the suspect had been, right before the first shot, "slashing at [the officer] with a knife" "in a confined space (a small room in a dark bank)[.]" *Rush v. City of Lansing*, 644 F. App'x 415, 423 (6th Cir. 2016); *see also*

---

[18] Though Defendants contend that no factually similar case establishes Harris's right not to be shot in these circumstances, the argument is again premised on the Court's acceptance of Defendant's contested version of the facts. *See, e.g.*, DE #85 at 5 (distinguishing cases on the basis that, here, "there is no dispute of fact as to whether Harris made any movement in the final moments before he was shot and, therefore, no impediment to summary judgment on the issue of qualified immunity"). There is, however, a dispute about just that—one that goes to the heart of whether Havicus reasonably perceived Harris as a threat. Plaintiffs need not find cases that apply the Defendants' chosen facts and, nevertheless, find the force unconstitutional. The inquiry is broader; under Plaintiffs' facts, a jury could surely find that no reasonable officer would have found Harris a threat, and, as noted, a non-threatening suspect's right to be spared fatal force was clearly established well before the events of this case.

*Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (finding deadly force reasonable where the suspect "approached to within five feet of [the officer] while brandishing a knife"); *Chappell*, 585 F.3d at 911 (finding deadly force reasonable where "[t]he knife-wielding suspect was undisputedly moving toward the officers and had closed to within five to seven feet in a dark, cluttered, enclosed space"); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (finding deadly force reasonable where, immediately before the officer fired a shot, the suspect had "advanced within a distance of four to six feet with [a] machete raised"); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 776 (6th Cir. 2004) (finding lethal force reasonable where the suspect "had not only extended the blade of his knife but had attacked [an officer] with it").

Critically, applying Plaintiffs' (reasonably supported) factual lens, these cases demonstrate that qualified immunity is improper here. Defendants' contrary argument hinges entirely on an assumption that the Court views the facts exactly as Defendants characterize them. Not so. Per Plaintiffs, Harris was neither wielding a knife nor advancing toward Havicus. Plaintiffs present expert testimony that Harris's post-mortem placement, captured in photos, is consistent with their view that Harris was not advancing toward or in dangerous proximity to Havicus. Further, Plaintiffs say that Havicus knew Alexander had no visible injuries from the alleged assault crime. In comparison, the knife-brandishing-plus-advancing formula defines the above-cited cases that found deadly force reasonable; such circumstances were central to the courts' conclusions that the officer reasonably perceived a threat in each scenario. And they are disputed in this case. If Harris was neither visibly in possession of a knife (much less one that he was threateningly wielding) nor moving toward Havicus, it is unclear how any perception of a threat could have been objectively reasonable. If a reasonable officer would not have perceived a threat, the force was unconstitutional. *See Mullins*, 805 F.3d at 766 (characterizing "the threat factor" as "a minimum

24

requirement for the use of deadly force"). Disputed questions of material fact surround whether a reasonable officer in Havicus's shoes could have perceived Harris as posing a threat. Resolving those questions in Plaintiffs' favor (as the Court must at this stage), Havicus's use of deadly force was not conclusively reasonable under the circumstances. *See Lopez v. City of Cleveland*, 625 F. App'x 742, 747 (6th Cir. 2015) (denying summary judgment where "there [we]re contentious factual disputes about the nature of [the suspect's] movements just before the shooting").

Of course, as Defendants note, the record contains support for their version, as well. Hacker and Straven have changed their stories since the KSP interviews.[19] Alexis testified that people urged her to change her story, too. A jury will have to decide whether the changing stories impact witness credibility and, in light of the physical and expert evidence provided, determine which version of events to credit. Defendants may view this as an easy call, but, at bottom, it is not the Court's call to make. Accordingly, as the applicable right was clearly established in this scenario (for the reasons discussed), and material fact issues prevent the Court from finding Havicus's force usage categorically reasonable, qualified immunity does not protect Havicus. A jury must hear the competing proof, parse the varying stories, make needed credibility findings to determine precisely what occurred on the fateful night, and decide whether a reasonable officer in these circumstances could have viewed Harris as an imminent threat, warranting the use of responsive lethal force.

The Court notes again its reliance on the totality, the Graham factors, and the other relevant Sixth Circuit cases. The Sheriff was, at most, seeking to question Harris for misdemeanor conduct, a crime of low gravity. Harris was in his own home and had been rooted rudely from the back bedroom where he retreated. In the living room, Havicus was all the way to the door. Far from

---

[19] Defendants tout the KSP interviews as conclusive on the facts. Those *unsworn* statements might be useful for impeachment, but the Court is doubtful about them representing substantive evidence under Rule 56.

resisting arrest or trying to flee, Harris appeared to simply want the officers desperately to quit his home. Finally, Havicus backed all the way to the door. Noting disputes in the record over the door and participant proximity, a jury should weigh whether Havicus did or did not have "a ready means of retreat or escape." Hicks, 958 F.3d at 436. He elected to terminate the encounter by terminating Harris—the factfinder must say whether Havicus made a reasonable choice, with Harris's life in the balance, at the time.

### The Estate's Supervisory Claim Against Shouse (Deadly Force)

"It is well-settled that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009)); *accord Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). To be liable, a supervisor must have "encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 421 (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir. 1982)); *see also Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)) (requiring evidence "that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct"). A "mere failure to act" will not suffice. *Peatross*, 818 F.3d at 241. "There must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury." *Id.* (quoting *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). The supervisor must have "d[one] more than play a passive role in the alleged violations or show mere tacit approval of the goings on[.]" *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

This claim requires little discussion. Plaintiffs argue that Shouse *expressly* authorized—orally encouraged and directed, in fact—Havicus to use deadly force against Harris. Multiple eyewitnesses (at least Hacker and Straven) indeed testified that Shouse told Havicus to shoot immediately before Havicus did so. DE 71, Hacker Dep., at 1654 ("[A]nd Kelly hollered, 'Shoot him.'"); DE 67, Straven Dep., at internal page 53 ("I read his lips, too. 'Shoot, shoot.'"). Nor is there any dispute that Shouse was present for all of the events immediately surrounding the fatal shooting. *Cf. Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 539 (6th Cir. 2018) (emphasizing the importance of physical supervisor presence and observing that it is only the "very rare case" in which "a supervisor does not have to be physically . . . present at the time of the constitutional violation") (quotation marks omitted). Defendants' sole argument for summary judgment on this claim is that Shouse was not, ultimately, the one to pull the trigger. However, per apt supervisory principles in the § 1983 excessive force context, a reasonable juror could conclude that Plaintiffs' (record-supported) version of events demonstrates Shouse's direct voice in the decisional chain. The Court thus denies Shouse qualified immunity as it pertains to his supervisory role in the fatal shooting.

### Hacker's Claim Against Havicus (Firearm Discharge)

Hacker claims that she too was the victim of unconstitutional force because she—standing next to Havicus when he fired the gun—suffered gunpowder burns to her face from the firearm's discharge. A threshold issue is what standard governs this claim: the Fourth Amendment reasonableness standard, or Fourteenth Amendment due process standard? Plaintiffs argue that the officers had, before the gunshot, seized Hacker for Fourth Amendment purposes because they functionally prevented her from leaving the apartment, by displaying and pointing their firearms. Per Plaintiffs, Hacker reasonably believed she could not leave the apartment under these

circumstances, and, thus, she was present for the subsequent shooting that injured her. Defendants, on the other hand, contend that the relevant circumstance is the shooting itself and, because the officers did not intend to use force on Hacker, she could not have been seized. In the latter case, a Fourteenth Amendment analysis pertains.

Taking a properly segmented approach, the Court perceives two distinct potential seizures—the officers' detention of Hacker within the apartment, and the firearm discharge that struck Hacker's face with gunpowder residue.[20] *See Mendez*, 137 S. Ct. at 1547 ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). It is apparent from the briefing, however, that Plaintiffs pursue an excessive force claim, as to Hacker, related only to the deadly force usage in proximity to Hacker. Accordingly, the Court looks to the circumstances directly surrounding the firearm discharge to determine whether the Fourth Amendment or the Fourteenth Amendment applies to Hacker's role in the event.

A seizure occurs only where the allegedly seized person is the intended object of the force used:

> [T]he Fourth Amendment "reasonableness" standard does not apply to section 1983 claims which seek remuneration for physical injuries inadvertently inflicted upon an innocent third party by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force.

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). As Defendants contend: "Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not

---

[20] These two events are, logically, two separate alleged unconstitutional acts, with distinct (though potentially overlapping to an extent) harm flowing from each. *See Ciminillo*, 434 F.3d at 464–65 (directing courts to consider "the incident out of which litigation arises").

intended targets of an attempted official 'seizure' are adjudged according to substantive due process norms." *Id.* The *Claybrook* plaintiff

> was the victim of an officer's errant bullet during a shootout involving her father-in-law, Royal Claybrook. The police were unaware that she was hiding inside her parked car during the shootout. The Claybrook court held that there was no seizure because the officers had no idea that they were exerting force on the plaintiff.

*Fisher v. City of Memphis*, 234 F.3d 312, 319 (6th Cir. 2000). The record shows that Hacker, though perhaps collaterally injured by the firearm discharge, was not the intended or known object of any seizure. *Cf. Ciminillo*, 434 F.3d at 465 (finding that the plaintiff "was not collaterally injured by an assertion of force against a third party; he was the direct target of police conduct" where the officer directly shot the plaintiff, potentially in an effort to keep him from moving); *Fisher*, 234 F.3d at 318 (concluding that the plaintiff was seized where her "car was the intended target of Defendant's intentionally applied exertion of force," regardless of whether officers intended to exert force upon the plaintiff's person, specifically). No reasonable juror could conclude, on this record, that Havicus intended to exert any force upon or directed force against Hacker. The gun discharging was undoubtedly an effect of the shooting act; though the latter was intentional, the former was merely an incidental consequence insofar as it impacted Hacker. The gun discharge plume striking Hacker did not seize her for Fourth Amendment purposes.

The Fourteenth Amendment thus applies; the question is whether the officers' conduct "shocked the conscience." *Ciminillo*, 434 F.3d at 464. The standard for demonstrating conscience-shocking conduct is high, allowing room for officer mistake:

> "[I]n a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]"

*Claybrook*, 199 F.3d at 359. No party disputes that the situation, once ignited, was quickly evolving in this case. The proper consideration is thus whether Havicus, in firing the gun, "acted with conscience-shocking malice or sadism towards the unintended shooting victim." *Id.* at 360. Plaintiffs have pointed to no evidence demonstrating that Havicus acted with malice or sadism toward Hacker when he fired the gun, and the Court finds no such proof in the record. Nor do Plaintiffs argue that Havicus's conduct toward Hacker was conscience-shocking, as they rely on the inapplicable Fourth Amendment reasonableness standard in the briefing.

Accordingly, the Court rejects any Fourth Amendment basis, finds no evidence to support a Fourteenth Amendment violation in this context, and grants Defendants' motion as to this particular excessive force claim.

### Alexis's, Straven's, and Hacker's Claims Against Shouse (Removal)

Hacker, Alexis, and Straven each testified that Shouse forcibly removed them from Harris's apartment post-shooting, pointing guns at them and otherwise aggressively handling them. "The relevant question here is whether the amount of force that the officers used to secure and detain Plaintiffs was objectively reasonable given the circumstances[.]" *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Accepting Plaintiffs' version of the facts, and applying the *Graham* reasonableness principles, a reasonable juror could find that Shouse used an unnecessary amount of force in removing the family members from the apartment. Critically, none of these Plaintiffs was suspected of any crime, and, per their description of the facts, they posed no threat to Defendants. And, no one has alleged that any one of the Plaintiffs was under or about to be under arrest. *See Hicks*, 958 F.3d at 435 (directing courts to consider "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight").

A reasonable juror could thus find a constitutional violation under these circumstances, per the facts as Plaintiffs allege them. *Cf. Binay*, 601 F.3d at 650 (finding a question as to whether the force was reasonable where officers pointed guns (among other things) at the plaintiffs during execution of a search warrant where the plaintiffs were present; the Court emphasized that the "[p]laintiffs had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee"). There is thus a jury question as to whether a constitutional violation occurred. Shouse's other physicality and rough handling contributes to this conclusion. He had a valid interest in securing the scene, but the law required reasonableness in attaining that goal.

Second, Plaintiffs' constitutional right to be free from unnecessary and excessive force (*i.e.*, force unreasonably severe under the circumstances) was clearly established well before the 2017 events of this case. The ultimate "question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Binay*, 601 F.3d at 652. In 2010, the Sixth Circuit recognized that "there [wa]s no doubt that *Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Id.*[21] It is clear that, by the time of the events in this case, the *Graham* standard for determining reasonableness of force was clearly established and applicable to scene participants. Shouse fairly was on notice that using more force than necessary to remove Plaintiffs' from the active investigative scene could be unconstitutional. *Cf. id.* ("Defendants were on notice

---

[21] The *Binay* Court specifically noted, in relation to non-arrestee occupants of premises: "Furthermore, the law is clearly established that the authority of police officers to detain the occupants of the premises during a proper search for contraband is 'limited' and that officers are only entitled to use 'reasonable force' to effectuate such a detention." *Id.*

that their detention of Plaintiffs during the search using means that were more forceful than necessary would constitute a Fourth Amendment violation.").

For these reasons, the Court denies Shouse qualified immunity on the removal-based excessive force claim.

B.    *§ 1983 Deliberate Indifference Claim (Count 2)*

The Sixth Circuit has not squarely decided whether inadequate medical treatment claims brought by arrestees arise under the Fourth or Fourteenth Amendment. In any event, the Estate's medical needs claim fails under both the objective reasonableness and the deliberate indifference standards. *See Esch v. Cty. of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017) (observing that the Court had never "squarely decided whether the Fourth Amendment's objective reasonableness standard can ever apply to a plaintiff's claims for inadequate medical treatment" but deciding that it need not resolve the issue, as the claims failed under both approaches).[22] As the Circuit has provided:

> Four factors inform our determination of whether an [official's] response to [a plaintiff's] medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. [*Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)] . . . "[T]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." 509 F.3d at 403.

*Esch*, 699 F. App'x at 515 (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011)).

---

[22] The deliberate indifference standard, a tougher bar to clear, requires both objective and subjective proof concerning the officers' alleged unresponsiveness to medical needs. *See Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

The proof surrounding the factorial analysis is materially undisputed. The medical need—trauma care post-shooting—was unquestionably serious, as all involved (including the officers) recognized. Relatedly, the scope of treatment sought, or indicated, consisted of life-saving measures in response to the gunshot wound. At bottom, though, no reasonable juror could find, on these facts, that Shouse and/or Havicus unreasonably delayed calling for emergency medical services. The time that elapsed between the gun's firing and Shouse's call requesting medical case was slight, per the undisputed portions of the record. Alexis pegged the first door knock at 11:03, and records show the 911 call at 11:09. With all of the intervening events sandwiched between those markers, it is plain that officers contacted emergency personnel immediately. That is the only conclusion the record supports. Under the circumstances, the Court finds that no reasonable juror could conclude that Defendants unconstitutionally ignored Harris's need for serious medical attention after the shooting. Finding no conceivable constitutional violation, based on the undisputed facts relevant to this claim, the Court grants summary judgment in favor of Defendants on this claim.

C.      *Failure to Intervene (Count 3)*

In order to establish a claim against a police officer for failing to intervene or for failing to protect from another officer's use of excessive force, a plaintiff must prove that the subject officer observed or had reason to know that excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 945–46 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "[O]fficers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights," *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001) (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)), "where that officer observes

or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official," *id.* (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Plaintiffs raise two distinct intervention claims, challenging (1) Shouse's failure to prevent Havicus from shooting Harris, and (2) Havicus's failure to prevent Shouse from using excessive force to remove Hacker, Straven, and Alexis from the apartment.

## Shouse – The Shooting

There is adequate evidence to submit this claim to a jury. Shouse was, indisputably, present for Havicus's entire seizure of Harris (using deadly force), and all accounts confirm that Shouse was aware of and observing the events unfold. Indeed, per Plaintiffs, Shouse was encouraging Havicus to use deadly force in the situation. *Cf. Jacobs*, 5 F. App'x at 395 (granting qualified immunity where the officer entered the scene after a fellow officer already "had begun the seizure," and the entering officer "did not observe or have reason to know the basis for [the] seizure"). In contrast, here, the facts indicate that Shouse had materially the same information as Havicus in the moments leading up to the shooting; nevertheless, Plaintiffs assert, he directed Havicus to use lethal force. As the Court has already found, material fact disputes preclude the Court from summarily finding the lethal force use reasonable, and thus constitutional, under the circumstances. Accordingly, given Shouse's presence during and first-hand observation of the relevant events, there is a jury question as to whether Shouse had a duty to intervene and prevent (or at least attempt to prevent) Havicus from shooting Harris. As Shouse was able (according to Plaintiffs' theory) to observe and comprehend the events with sufficient clarity to direct Havicus to shoot Harris, Shouse certainly had time and opportunity to counsel Havicus against the use of deadly force before the

shooting actually occurred. Shouse had actual authority over the scene, and a jury must assess his responsibility for the outcome.

Further, it was clearly established, at the time of the shooting, that Shouse would have had a duty to intervene to prevent Havicus from using unconstitutional force under these circumstances (where, as discussed, the record supports Plaintiffs' position that Shouse observed and participated in the events and could have acted to stop them). *See, e.g.*, *Rolen v. City of Cleveland*, 657 F. App'x 353, 366 (6th Cir. 2016) (recognizing that the Circuit had held, as early as 1997, "that police officers may be held liable for a failure to protect an individual from the use of excessive force"); *Jacobs*, 5 F. App'x at 395 (outlining the relevant standard for a failure-to-intervene claim in the seizure context, in 2001). Shouse was on notice, on March 22, 2017, that observing (with full knowledge of the situation) and allowing a fellow officer's use of excessive force, rather than acting to prevent it, would violate the victim's constitutional rights. Qualified immunity is thus unwarranted.

## Havicus – Removal from Apartment

The evidence demonstrates that Havicus, in the chaos immediately after the shooting, remained in the apartment securing the scene. There is no evidence that Havicus participated in, observed, or otherwise was aware of Shouse's tactics in clearing the apartment. Rather, Alexis's, Straven's, and Hacker's testimony all indicates that only Shouse was around for and involved in forcibly removing them from the apartment. Plaintiffs advance no proof that Havicus either observed or had "reason to know the basis for" Shouse's treatment of Plaintiffs. Further, given the lack of proof concerning Havicus's awareness of these events, there is no evidence that Havicus could have timely prevented the uses of force. The events spiraled quickly post-shooting, and the record demonstrates that Havicus would have lacked opportunity to timely intercede and stop

35

Shouse from pointing his gun at or aggressively manhandling Plaintiffs in the process of removing them from Harris's apartment. Accordingly, no reasonable juror could find that Havicus acted unconstitutionally in failing to intervene, and Havicus is entitled to qualified immunity on the claim.

### D.    § 1983 False Arrest (Count 4)

The parties cross-move for summary judgment on this claim. DE ##64, 69. As the standard requires, the Court considers the facts in favor of the non-movant in each instance. This claim hinges on whether probable cause existed to arrest Harris. *See Frodge v. City of Newport*, 501 F. App'x 519, 526 (6th Cir. 2012) ("In order for a plaintiff to prevail on a theory of wrongful arrest under § 1983, he must prove that the police lacked probable cause."). "A plaintiff's Fourth Amendment rights are not violated if an officer does not have an arrest warrant so long as 'probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law.' *Id.* (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). In evaluating probable cause, the Court looks at the totality of the circumstances, from the perspective of a reasonable on-scene officer. *Id.* "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010–11 (6th Cir. 1999)). Probably cause is a flexible, common-sense inquiry, and it "requires only 'a "fair probability" that the individual to be arrested has either committed or intends to commit a crime.'" *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal citation omitted)). "Mere speculation that a crime occurred," however, "is insufficient to establish probable cause." *Id.* at 526–27 (citing *McCurdy v. Montgomery Cnty., Ohio*, 240 F.3d 512, 519 (6th Cir. 2001)).

Shouse and Havicus assert that they had probable cause to believe that Harris had committed Assault 4th under Kentucky law based on Alexander's earlier statements. "A person is guilty of assault in the fourth degree when: (a) He intentionally or wantonly causes physical injury to another person; or (b) With recklessness he causes physical injury to another person by means of a deadly weapon or a dangerous instrument." KRS § 508.030(1). The offense is a Class A misdemeanor. *Id.* § 508.030(2).

There inarguably was not probable cause to arrest Harris for this crime. Havicus encountered Alexander for five minutes. Her story related a minor physical encounter on the day, one that involved no physical injury. DE #66, Alexander Dep., at 1396 (denying any injury); DE #59, Havicus Dep., at 414-15. Havicus expressly confirmed the absence of injury from his own observation. Kentucky law defines "physical injury" as "substantial physical pain or any impairment of physical condition." KRS § 500.080(13). Without injury, there would have been no basis to support this required element of the Assault 4th crime.[23]

Further, there is no evidence to support the idea that Alexander related to Havicus any details about the earlier physical encounter between her and Harris in the preceding two weeks. That event could arguably have contributed to or supported probable cause for assault, but the record simply does not show that Alexander, at the time, made anything more than a vague allusion to a "prior altercation" that she had not reported. DE #59, at 413.

Defendants focused their thinking that night putatively on assault, but in briefing have pivoted to terroristic threatening as a possible charge. Alexander relayed to Havicus, before he left

---

[23] The absence of physical injury likewise forecloses resort to KRS 431.005(2)(a), which permits warrantless arrests if an officer "has probable cause to believe that the person has intentionally or wantonly **caused physical injury to** a family member, member of an unmarried couple, or another person with whom the person was or is in a dating relationship." *Id.* (emphasis added).

her location, that Harris had threatened to kill law enforcement, saying "he would gut the police if they came to arrest him." DE #59, at 415. Under Kentucky law, terroristic threatening is a Class A misdemeanor. It occurs when a person "threatens to commit any crime likely to result in death or serious bodily injury to another person." KRS 508.080(1)(a). Though there are questions about whether and when Harris may have made such a statement, Alexander provided direct and first-hand information about the threat, which, if accurate, would fairly support probable cause as to the terroristic threatening crime. A threat to "gut" police surely meets the standard.

In this context, a jury could find or reject (as the KSP Detective did, DE #61, (Short Dep.) at 924-25) the existence of probable cause. As such, neither side earns summary judgment.[24]

However, the Court must add a few notes:

First, the officers did not have a warrant. Under Kentucky law, a peace officer can arrest for a misdemeanor, without a warrant, *only* if the crime occurs in the officer's presence. KRS 431.005(1)(d). Thus, probable cause or not, Kentucky law would not have permitted Harris's arrest in this context. This, the jury will hear.

Second, the officers did not pursue the matter as involving terroristic threatening on the night in question. Because probable cause is an objective inquiry, the Court finds it proper to allow the jury to weigh the alternative crime now postulated by the lawyers, but the jury will be aware that the charge the officers actually perceived was one for which probable cause lacked.

---

[24] The law clearly requires probable cause as the basis for arrest. Where debatable, the existence of probable cause typically presents a jury question. *See Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) ("The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible.").

E.      *§ 1983 Unlawful Entry (Count 5)*

Both sides also seek summary judgment on this claim. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," ensuring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Baker v. City of Trenton*, 936 F.3d 523, 530 (6th Cir. 2019), *cert. denied sub nom. Baker v. City of Trenton, Michigan*, 140 S. Ct. 1109 (2020) (quotation marks omitted). This presumption is particularly strong in connection with a search of one's home: "[I] is beyond dispute that the home is entitled to special protection as the center of the private lives of our people[.]" *Georgia v. Randolph*, 115, 126 S. Ct. 1515, 1523 (2006) (quoting *Minnesota v. Carter*, 119 S. Ct. 469, 478 (1998) (Kennedy, J., concurring)).[25] Further, the presumption is stronger yet where the occupant's alleged crime is merely a misdemeanor. *See Coffey v. Carroll*, 933 F.3d 577, 587 (6th Cir. 2019) (quoting *Welsh v. Wisconsin*, 104 S. Ct. 2091, 2098 (1984)) ("When the government's interest [in the entry] is only to arrest for a minor offense, th[e] presumption of unreasonableness is difficult to rebut[.]") "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1947 (2006).

One such exception is consent—Defendants here argue, in briefing, that Harris consented to their entry of his home. "It is well settled under the Fourth and Fourteenth Amendments that a

---

[25] An apartment unit is entitled to the same degree of Fourth Amendment protection as the inside of a home. *See United States v. Carriger*, 541 F.2d 545, 551 (6th Cir. 1976).

search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 93 S. Ct. 2041, 2043 (1973) (quoting *Katz v. United States*, 88 S. Ct. 507, 514). The party asserting consent must demonstrate that the consent was voluntary under the circumstances. *Id.* at 2059.

Under Defendants version of the facts (the operative set when evaluating Plaintiffs' summary judgment request), Harris opened the door slightly, enough that he would have recognized the officers standing there, and then stepped back enough to fully open the door and allow the entire group entry to the apartment. "Consent to a search may be nonverbal so long it is not the product of duress, coercion, or trickery." *United States v. Ortiz*, 455 F. App'x 669, 671 (6th Cir. 2012) (quotation marks omitted). Stepping back in fear does not amount to consent, *see United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004), but the Sixth Circuit has repeatedly found consent where an apartment owner opens the door, has opportunity to recognize that the people seeking entry are officers, and nonetheless steps back to allow the officers' entry (provided there is no evidence of coercion or duress). *See id.* at 588 (finding that a reasonable person "would understand assent to have been given" where the "officers were instantly recognizable as policemen when Carter opened the door[,]" "properly asked permission to enter, and Carter stepped back, letting them in"); *United States v. Beasley*, 199 F. App'x 418, 424 (6th Cir. 2006) (finding consent where "Frye opened the door slightly, affording the officer the opportunity to identify himself and request entry[,]" and "Frye then opened the door wider and stepped back"); *United States v. Jackson*, 468 F. App'x 447, 453 (6th Cir. 2012) (seeing no clear error in the court's consent finding where the homeowner "allowed the officers to follow him inside without objection"); *United States v. Ortiz*, 455 F. App'x 669, 671–72 (6th Cir. 2012) (observing that the

owner's conduct in "stepping back, gesturing, and opening the door wider[,]" absent proof that the owner did so out of fear or from coercion, "unambiguously conveyed" permission for officers to enter).

Consent is the lone argument presented.[26] No reasonable juror could find consent on the record presented. The Court need look no further than the views of both Shouse and Havicus. Each expressly testified that Harris had not consented. DE #60, Shouse Dep., at 744 (denying that Harris consented to any search). Per Havicus, under oath:

> Q.    And Charlie had never said come into the apartment, correct?
> A.    Correct.
> Q.    And he had exhibited his disinterest in talking to you or going to jail, so it does not appear that he gave you consent to enter, correct?

DE #59, Havicus Dep., at 449. Indeed, Harris had been "upset and irate" with the officers at the door, *see id.* at 445, and had expressly told the officers to leave. He also had slammed the door upon seeing the officers outside with Hacker. Hacker, both Harris's sister and property manager, had no right to force Harris to allow the officers in. There are disputes over just what Shouse and Havicus said, and who walked through the threshold first, but there is not sufficient evidence for a jury to find that Harris, the head of the house, consented to entry by Havicus and Shouse. The Defendants' best case is that they pushed through a door Harris slightly opened after being threatened that Hacker would user her key. As Alexis testified, the officers pushed through Hacker and entered. Havicus himself "guessed" there was consent, and he and Shouse "just came on in." DE #59, at 199. Importantly, all agree that Harris was irate, and Alexis said he immediately yelled for the officers to "Get out of my house." DE #65, at 1360-61. Further, Harris almost immediately

---

[26] Defendants do not argue that exigent circumstances required warrantless and non-consensual entry, and the record would not support such a conclusion. Nor do Defendants argue that any other warrant exception applies.

retreated to the back bedroom and slammed that door. This is not, under any reading, the conduct of a consenting homeowner; the Constitution forbade the entry.

Further, a reasonable officer in Havicus's and Shouse's position would have known that Harris had a clearly established right to be free from law enforcement's non-consensual, forcible entry into his home. *See, e.g.*, *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (noting, in 2005, that previously announced "bedrock Fourth Amendment principles . . . demonstrate[d] that" a "forced warrantless entry into" a suspect's home "was presumptively unreasonable" unless an exception applied). And, such an officer would also have known that Harris's actions did not constitute voluntary and valid consent.

The Court finds the entry unlawful as a matter of law. The jury will decide damages on the claim.

F.      *§ 1983 Municipal Liability (Count 6)*

"[A] municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 98 S. Ct. at 2037). To demonstrate such, a plaintiff generally must show: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*,

735 F.3d 462, 478 (6th Cir. 2013). Plaintiffs assert that Owsley County is liable under *Monell* for the officers' use of unconstitutional deadly force and for their unlawful entry.[27]

### Excessive Force

Plaintiffs pursue three primary avenues to County liability for the deadly shooting. First, they contend that Shouse's encouragement of and intimate involvement in the shooting itself places Owsley County on the hook for Harris's death because Shouse was a policymaker for the County. Second, they argue that the absence of any less-than-lethal force policy in the department renders the County liable. Third, Plaintiffs assert that Shouse's failure to investigate or act in response to the shooting demonstrates department ratification of the unconstitutional acts.[28]

"[N]ot every 'law enforcement' activity (*e.g.*, stop, arrest, etc.) by a sheriff (or other chief law enforcement official)—whether a matter of official business or a misuse of power to advance a private agenda—represents the 'official policy' of the local government." *Wooten v. Logan*, 92 F. App'x 143, 146–47 (6th Cir. 2004). Rather, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered*." *Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1299 (1986) (emphasis added). In other words, single-act *Monell* liability cannot attach absent "a deliberate choice to follow a course of action [ ] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 106 S. Ct. at 1300.

---

[27] It does not seem, based on Plaintiffs' summary judgment response, that Plaintiffs maintain claims against the County arising out of any non-lethal force usage or out of the argued deliberate indifference to Harris's medical needs. The Court so proceeds.

[28] Plaintiffs assert no failure-to-train theory.

A Kentucky Sheriff has substantial law enforcement power. The office is an elected county position and a creature of the Kentucky Constitution. *See* Ky. Const. § 99. Further, by statute, the Sheriff has essentially unquestioned say, as to the conduct of law enforcement, within his or her jurisdiction. *See* KRS 70.060 (providing that any sheriff "may command and take with him the power of the county, or a part thereof, to aid him in the execution of the duties of his office"). The Commonwealth expressly makes the office of Sheriff answerable to the actions and omissions of deputies. KRS 70.040.

The matters at issue in this case—whether and how to approach Harris, whether to enter the apartment, whether to use fatal force against Harris, how to clear the scene—were all things Shouse directly (as alleged) oversaw, directed, and participated in. Further, Havicus expressly retrieved Shouse before going to the call. Shouse was acting as law enforcement; there is no suggestion of an ultra vires, criminal, or personal goal. This case is not *Wooten*, where the sheriff acted to advance his personal, criminal goals. Rather, Shouse, the county's chief law enforcement official, was micromanaging a criminal investigation. He was, in that role, the holder and steward of county policymaking power or personal goal. He was making the direct elections as to the manner of proceeding. Thus, he was the County, for liability purposes. *See Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013)(final policymaker liable if chosen "course of action . . . shown to be the moving force behind or cause plaintiff's harm and citing cases where decisionmaker chose manner of search or manner of handling evidence).

The Estate also claims that Owsley County committed a constitutional violation by failing to include, in its force policy or elsewhere, any directive that deputies must carry less-than-lethal

44

force options.[29] The absence of a governing policy can be actionable "where the need to act is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need" in failing to institute a policy controlling the situation. *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012). A plaintiff can show either "that the municipality possessed actual knowledge indicating a deficiency with the existing policy . . . (or lack thereof), such as where there have been recurring constitutional violations[,]" or that the need for a policy was "plainly obvious." *Id.* at 648–49. The latter case arises only "in a narrow range of circumstances where a violation of federal rights may be a highly predictable consequence of [the municipality's failure to act]." *Id.* at 649 (quotation marks omitted).

No reasonable juror could conclude that such circumstances are present here. Plaintiffs do not identify or argue based on any recurring violations in this context. And, Plaintiffs do not explain how the absence of an addition to the non-lethal force policy that specifically required officers to carry non-lethal weapon options[30] addresses a plainly obvious gap in department policy. The cases and record do not support a conclusion that unconstitutional deadly force is a "highly predictable" result of officers failing to carry non-lethal weapons. *Cf. City of Canton, Ohio v. Harris*, 109 S. Ct. 1197, 1205 (1989) (finding the absence of a deadly force policy unconstitutional where the department "armed its officers with firearms" for the purpose of potentially apprehending fleeing suspects). In contrast with *Canton*, Plaintiffs have produced no evidence that the absence of a policy requiring officers to carry tasers and batons, or other non-deadly options,

---

[29] The policy addresses non-lethal force options (and provides the standards governing the use of such force), but it does not require deputies to carry non-lethal force options.

[30] The policy in fact contemplates non-weapon, non-lethal force tactics. If trained, presumably each officer would have the ability to execute such non-lethal tactics at any point, regardless of whether he carried a weapon.

would predictably lead to the harm that occurred in this case. Accordingly, Plaintiffs have not shown that the absence of the urged policy amounts to a constitutional violation in this case.

Lastly, the Court observes that Shouse's argued act of ratification—in failing to initiate an investigation into Havicus's conduct—alone is insufficient to create County liability for the conduct. Though an explicit or implicit "look-the-other-way" policy may be relevant in assessing whether there is a custom, formal or informal, of ratifying and concealing officer wrongdoing, this lone example shows no widespread pattern and, as such, is insufficient to establish County liability for the excessive force in this case. To hold the County liable, Plaintiffs must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"; where the plaintiff cites an unofficial policy on behalf of the municipality, he must show that, though the policy was never "formally approved by an appropriate decisionmaker," it was nevertheless "so widespread as to have the force of law." *Bd. of County Comm'rs of Bryan County v. Brown*, 117 S. Ct. 1382, 1388 (1997). Plaintiffs have not shown that an alleged act of ratification (even if it occurred as Plaintiffs describe) either represents Shouse's own making of disciplinary policy or is representative of a more pervasive disciplinary problem within the department. That is, nothing on this record connects the harm Plaintiffs suffered—the tragic use of lethal, and potentially unconstitutional, force on Harris—with Shouse's subsequent failure to investigate the incident. There is no indication that there was a department policy of declining to investigate officer force, whether created by Shouse in this instance or otherwise persisting within the department. Critically, the cases Plaintiffs point to consider the failure to discipline **a factor** in assessing whether an unofficial policy of tolerating excessive force existed, but stop short of concluding that it alone renders a county liable for a single instance of officer conduct. *See Marchese v. Lucas*, 758 F.2d 181, 189 (6th Cir. 1985) (finding a policy of excessive force tolerance where the record supported training and disciplinary

46

failures); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (finding supervisory and disciplinary failures sufficient to demonstrate an unconstitutional policy "in view of the numerous similar incidents"). At bottom, there is not enough on this record for a reasonable juror to conclude that Shouse's failure to investigate Havicus was representative of or formed County policy, or that such a policy or custom contributed to the harm Harris suffered.

Thus, the Court permits Plaintiffs to proceed against the County under the *Pembaur* theory, as discussed.

### Unlawful Entry

As to unlawful entry, Plaintiffs do not advance any specific theory for County liability.[31] The Court, however, adopts the same analysis it did with respect to Shouse's role and liability from the excessive force context. Shouse was at point on the entry, and he made the decision, as holder of county power, to invade Harris's domicile without a warrant, exigency, or permission. Sheriff qua county, in this case, means the jury will evaluate the liability of the County for Shouse's direct decisional role.

G.   *State Law Claims and Punitive Damages (Claims 8 through 13)* [32]

### Assault and Battery

In Kentucky, assault and battery are distinct and independent torts. *Leath v. Webb*, 323 F. Supp. 3d 882, 902 (E.D. Ky. 2018); *Ali v. City of Louisville*, No. 3:05CV-427-R, 2006 WL 2663018, at *4 n.7 (W.D. Ky. Sept. 15, 2006). Though "[a]ssault . . . merely requires the threat of

---

[31] Though Plaintiffs' response refers to the DE #69 motion for this argument, *see* DE #81 at 31, that motion contains no County-specific unlawful entry argument.

[32] The Court applies substantive Kentucky law to each state claim. *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.").

unwanted touching of the victim," "battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). "The use of excessive force by a police officer constitutes the intentional tort of battery." *Ali*, 2006 WL 2663018, at *8.[33]

Plaintiffs' response brief attends little to the state law issues. The parties agree that the assault and battery claims "rise and fall" with the federal causes of action. Though the Kentucky qualified immunity analysis is slightly different than its federal counterpart, *see Coitrone v. Murray*, 642 F. App'x 517, 524 (6th Cir. 2016), the result here is the same. Kentucky's equivalent of qualified immunity protects officers that make "good faith judgment calls [ ] in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Specifically, it protects officers for "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . (2) [made] in good faith; and (3) within the scope of the employee's authority." *Id.* "[B]ad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness[.]" *Id.* at 523.

The analysis, here, tracks the federal reasoning. On this record, a reasonable juror could find that Havicus's use of force, actively encouraged and sanctioned by Shouse, was objectively excessive and thus unreasonable under the circumstances, constituting a battery claim under Kentucky law. *See City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973) (describing reasonable force as "no more force than was reasonably necessary, or so appeared to him in the exercise of reasonable judgment" under the circumstances). A reasonable juror could likewise find that, for the reasons previously discussed in this opinion, Harris's right to be free from such force in this

---

[33] Plaintiffs do not substantively argue or elaborate on any specific assault claim.

particular scenario was clearly established at the time of the events at issue. This would equate to bad faith, for state immunity purposes. The Court thus denies qualified immunity, and the state battery claim survives for jury review.[34]

### False Arrest / Imprisonment

In Kentucky, "there is no distinction between the torts of false arrest and false imprisonment; the legal analysis is the same" in the arrest (or attempted arrest) context. *Ming Wen Chen v. Pawul*, No. 2016-CA-001860-MR, 2018 WL 3814764, at *2 (Ky. Ct. App. Aug. 10, 2018) (citing *Lexington-Fayette Urban County Gov't v. Middleton*, 555 S.W.2d 613 (Ky. App. 1977)); *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (recognizing "that every confinement of a person is an imprisonment, whether it occurs in a prison or a house," and thus "refer[ring] to the torts of false imprisonment and false arrest together as false imprisonment"). "False imprisonment is the intentional confinement or instigation of confinement of a plaintiff of which confinement the plaintiff is aware at the time." *Dunn*, 226 S.W.3d at 71. The central inquiry is whether there existed legal authority for the confinement:

> An action for false imprisonment may be maintained where the imprisonment is without legal authority. But, where there is a valid or apparently valid power to arrest, the remedy is by an action for malicious prosecution. The want of lawful authority is an essential element in an action for false imprisonment. Malice and want of probable cause are the essentials in an action for malicious prosecution.

*Smith v. Stokes*, 54 S.W.3d 565, 567 (Ky. Ct. App. 2001) (quoting *SuperX Drugs of Kentucky, Inc. v. Rice*, 554 S.W.2d 903 (Ky. Ct. App. 1977)).

"Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has

---

[34] The Court presumes for purposes of the analysis, that the officers' acts were discretionary in this case, but need not decide the issue, as qualified immunity is inapplicable in either case.

probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it." *Dunn*, 226 S.W.3d at 71.[35] Kentucky's probable cause standard mirrors the federal standard. *See Williams v. Commonwealth*, 147 S.W.3d 1, 7 (Ky. 2004). As already discussed, a fact question persists on the issue of probable cause (as to terroristic threatening). "If an officer has probable cause to arrest, Plaintiffs cannot maintain an action for false arrest." *Hartman v. Thompson*, 931 F.3d 471, 483 (6th Cir. 2019) (citing *Dunn*, 226 S.W.3d at 71). Of course, as noted, the officers had no warrant and arguably no power to arrest Harris, without a warrant, in the misdemeanor context.

Hacker, Alexis, and Straven do not have a claim to be submitted. There is not sufficient evidence to show they were detained, in alignment with this tort's elements:

> Kentucky cases define false imprisonment as being any deprivation of the liberty of one person or detention by another without the person's consent whether done by actual violence, threats or otherwise . . . To sustain a recovery for the tort of false imprisonment, a complainant must establish that he was detained and that the detention was unlawful . . . Moreover, restraint occurs if it arises out of words, acts, gestures, which induce reasonable apprehension that force will be used on a person if they do not submit.

*Akers v. Roberts*, No. 2014-CA-001394-MR, 2016 WL 1178681, at *5 (Ky. Ct. App. Mar. 25, 2016). The court further concluded that the plaintiffs failed "to establish that the actions or words of the [officials] would cause a reasonable person to believe that they were not free to leave." *Id.*

---

[35] Though the cases distinguish between a misdemeanor occurring in the officer's presence and other misdemeanors, Kentucky statutory law authorizes police to arrest individuals based on "probable cause . . . that the person has intentionally or wantonly caused physical injury to a . . . person with whom the person was or is in a dating relationship." KRS § 431.005(2)(a); *see Ming Wen Chen*, 2018 WL 3814764, at *2 (citing KRS § 431.005) ("A police officer is statutorily authorized to conduct a warrantless arrest if he directly observes the suspect committing a felony or a misdemeanor or if he has probable cause to believe that the suspect has committed a felony."). The Court rejected probable cause premised on any physical injury and instead validated a jury question on probable cause as to terroristic threatening.

Harris was the officers' focus at all times. They asked Hacker to go to the scene. Until the shooting, the record does not show that Havicus or Shouse reasonably directed any coercive action against the other occupants. *Cf. United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) ("A seizure, within the meaning of the fourth amendment, occurs only when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave."); *Halsell v. Etter*, 208 F. App'x 413, 418 (6th Cir. 2006) (finding a seizure for Fourth Amendment purposes where "the Officers entered [a barber shop] with their weapons drawn and, while scanning the barbershop for the suspect, pointed their weapons at [patrons of the shop]" because, "[g]iven the circumstances, . . . a reasonable individual would not feel free to leave"). The Court rejects this claim as to Hacker, Alexis, and Straven. To the extent they complain of force use post-shooting, their excessive force claims cover the conduct.

## Intentional Infliction of Emotional Distress (IIED)

This claim warrants dismissal, as it is duplicative of Plaintiffs' assault and battery claims. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993) ("recogniz[ing] that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie"). Further, Plaintiffs have no proof on the required elements of actor intent (*i.e.*, only to cause extreme distress to the victim) or the documented degree of harm. The Court thus grants Defendants' motion as to this claim.

## Wrongful Death

"[W]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it[.]" KRS § 411.130. "If the act was willful or the negligence gross, punitive damages may be

recovered." *Id.* Defendants do not address this claim. In any event, consistent with the Court's excessive force analysis, the Court concludes that a reasonable juror could find that Havicus, with participation or direction of Shouse, wrongfully caused Harris's death through use of objectively unreasonable force. The Court will not dismiss this claim without particularized argument.

### Negligence and Loss of Consortium

Plaintiffs' negligence claims fail in this context. "When an officer uses more force than is necessary, he commits an intentional act." *Durmov v. Univ. of Kentucky*, No. 5:12-CV-258, 2013 WL 488976, at *2 (E.D. Ky. Feb. 7, 2013) (citing *Ali*, 2006 WL 2663018, at *8). "Thus, when an officer uses excessive force, he can be liable for the intentional tort of battery, but he cannot be liable for negligence." *Id.* Because the Court concludes that Plaintiffs have pointed to sufficient evidence of intentionality for battery purposes, it conversely finds that there is insufficient evidence to support an inconsistent negligence theory. The Court dismisses this claim.

The Court does not reach, however, the loss of consortium claim, as Defendants do not address it in their motion.

### Punitive Damages

Punitive damages are available in a § 1983 individual-capacity suit, *see Kentucky v. Graham*, 105 S. Ct. 3099, 3106 n.13 (1985), and as a remedy for wrongful death, *see* KRS § 411.130(1) ("If the act was willful or the negligence gross, punitive damages may be recovered."). Defendants address only the issue of punitive damages for the County. Plaintiffs concede that a county (a municipality) can have no punitive damage liability under § 1983. State sovereign immunity would cloak the County as to any state law claim. *McNally v. Tabor*, 2019 WL 6044882, at *4 (E.D. Ky. 2019)("'Because the county is a political subdivision of the state, it is 'cloaked' with sovereign or governmental immunity." *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008)"). Plaintiffs cite no law that would allow a claim for punitive damages against a

Kentucky county. As such, the Court grants the motion but only insofar as it eliminates punitive damages as a recovery element against the County.

## V.    CONCLUSION

For all of these reasons, the Court **ORDERS** as follows:

1.  The Court **GRANTS in part** and **DENIES in part** DE #64, on the terms here outlined;

2.  The Court **GRANTS in part** and **DENIES in part** DE #69;

3.  The Court **DENIES**, though on terms, DE #62; and

4.  The Court **DIRECTS** each side to file a status report, covering the listed topics **within 21 days**:

    a)  Trial readiness (*i.e.*, the anticipated amount of time needed for pretrial preparation);

    b)  Estimated trial length;

    c)  Any periods of likely unavailability in the remainder of 2020 and first half of 2021;

    d)  Amenability to court-involved mediation; and

    e)  Any other matters relevant to pretrial and trial scheduling.

This the 2nd day of September, 2020.

Signed By:

**Robert E. Wier**

**United States District Judge**